## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE **DIVISION**
### **CIVIL ACTION NO.** 5:19-CV-00037-KDB-DCK

| | | |
|---|---|---|
| AMV HOLDINGS, LLC | ) | |
| MADVAPES FRANCHISING, LLC, | | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| AMERICAN VAPES, INC., et al. | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiffs AMV Holdings, LLC and Madvapes Franchising, LLC (collectively "Madvapes"), is a franchisor in the "vaping" / e-cigarette business. Defendant American Vapes ("AV" or "Mellow Vapes" (its new trade name)) is a former Madvapes franchisee that terminated the franchise relationship in March 2019. The individual defendants – Bryan Hough, Craig Kinlaw and Wayne Kinley – are owners of AV and/or guarantors of the parties' franchise agreements. Madvapes claims in this action that AV is continuing to operate eight "vaping" stores which had been Madvapes' franchise locations under their new Mellow Vapes trade name thereby infringing Madvapes' trademarks and breaching the parties' franchise agreements. In response, AV has filed counterclaims asserting its own claims of breach of contract and unfair business practices related to Madvapes' use of the common advertising fund into which franchisees were required to contribute.

Now before the Court is Madvapes' Motion for Preliminary Injunction, (Doc. No. 16), which seeks to force AV to close all its stores under the franchise agreements' covenant not to compete, prohibit infringement of Madvapes' trademarks and enforce confidentiality and other

post termination provisions of the franchise agreement. The Court has carefully reviewed the motion and considered the parties' briefs and exhibits and their arguments during the hearing on this motion held on July 19, 2019. For the reasons discussed below, the Court will enter the following **Preliminary Injunction**, which in effect **GRANTS** in part and **DENIES** in part Madvapes' motion.   Madvapes is entitled to a preliminary injunction to enjoin AV from using Madvapes' trademarks (which Defendants say they have already stopped using). Madvapes is also entitled to a preliminary injunction to enforce certain portions of the post termination provisions in the franchise agreements. However, Madvapes is not entitled to a preliminary injunction requiring Defendants to close their businesses because, among other reasons, the Court finds that Madvapes is not likely to succeed on the merits of its claim to enforce the franchise agreements' covenant not to compete.

## I.    LEGAL STANDARD

The standard for considering a motion for a preliminary injunction is well established. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 24, 32 (2008) (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right."). The Fourth Circuit has similarly recognized that the grant of such a remedy involves "the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Centro Tepeyac v. Montgomery Cnty*., 722 F.3d 184, 188 (4th Cir.2013) (en banc).

In order to receive a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary

injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter*, 555 U.S. at 20; *Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Limited Partnership*, 918 F.3d 353 (4th Cir. 2019); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Each of these four requirements must be satisfied. Id.

Accordingly, a plaintiff must make a "clear" showing both that he is likely to suffer irreparable harm absent relief and he is likely to succeed on the merits at trial, as well as demonstrate the balance of equities favors him, and the injunction is in the public interest. *See Winter*, 555 U.S. at 22; *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir.2009), vacated on other grounds, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). However, plaintiffs "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir.2013).

## II.     FACTS AND PROCEDURAL HISTORY

Madvapes describes the alleged history of the parties' franchise relationship in the Amended Verified Complaint ("Complaint"). See Complaint at ¶¶ 22-24, 30, 35-41. Beginning in 2015, AV became a licensee of Madvapes in Easley, SC. AV added licensed stores in Anderson, South Carolina and Lincolnton and Shelby, North Carolina later in 2015. Over time, these "licensed" stores became "franchise" locations and other franchise locations were added in Boone, Statesville and Belmont, North Carolina and Indian Land, South Carolina from 2016 to March 2018. *Id*. The purported April 2017 Franchise Agreement ("FA") for the Statesville store is attached to the Complaint. *Id*. at ¶ 34. Madvapes alleges that the provisions of each of the

franchise agreements for the various locations are in all material respects the same as the FA. *Id.* at ¶42.[1]

The FA has an initial term of 10 years and is specifically limited to a single franchise location. FA, ¶¶ 1, 2. In the FA, AV agrees that (with a carveout for "Non-traditional Locations" such as malls, airports, schools and sports arenas) it will not locate or license another store within a very limited territory around the approved franchise location (intended to encompass "a working population of approximately 15,000"). The franchisee is not permitted to solicit customers by means of an electronic remote-entry system, such as sales over the internet. Thus, by contract, each franchise location is intended to be only a "brick and mortar" store that services a small protected area (although customers are not required to live in the assigned territory). FA, ¶ 5.

In Section 7(a) and 7(b) of the FA, the franchisee agrees that it will not make any unauthorized use of the Madvapes trademarks and that any unauthorized use is an infringement of Madvapes' rights. The FA further provides that "customer data" and inventions, business plans, ideas, etc. (very broadly defined) that are created in whole or part during the franchise term belong to Madvapes. FA, ¶ 7 (g), (h)).

Section 8(k) provides that the franchisee is not allowed to maintain any social media sites associated with the Madvapes trademarks without Madvapes' consent, but the FA does not prohibit the franchisee from continuing to use the same social media site so long as it does not use the Madvapes' marks. However, with respect to telephone numbers, upon termination the

---

[1] As discussed below, Defendants dispute the existence and validity of a number of the franchise agreements, arguing that all the signed agreements have not been produced and/or Madvapes did not timely provide the required disclosure in advance of their execution.

franchisee agrees not to use the same numbers for another business. FA at ¶ 9; *see also*, FA at Exhibit F (discussed below).

Section 13 of the FA gives Madvapes significant (assignable) rights in the event of franchisee's termination of the FA without cause, which is what Madvapes contends has happened. Madvapes has the option within 60 days of the termination to purchase for fair value the Franchised Business (including the land on which the business operates if it is owned by the franchisee or to take over the lease) and/or the right to purchase any current, usable and saleable inventory. However, there is no evidence in the record that Madvapes timely exercised any of these options.

Section 14 contains the FA's Non-Competition provisions. Section 14(b) restricts Defendants from "[d]irectly or indirectly entering into the employ of, render any service to or act in concert with any person, partnership [etc] that owns, operates, manages, [etc]" any "Competitive Business"[2] or "[b]ecome interested in directly or indirectly as an individual, partner, shareholder, …, agent, … spouse, or in any other relationship or capacity" any "Competitive Business" for a period of two years "in the same state in the United States as (i) the [Franchised Locations] or (ii) any MadVapes franchised business or development territory in existence at the Effective Date[3] … or by any means, including, without limitation, sales via the internet or catalogs." Madvapes argues that Defendants should be prohibited from operating in North Carolina and South Carolina based on this provision.[4]

---

[2] "Competitive Business" is defined as "any business that sells electronic cigarettes or electronic cigarette accessories that are the same as those sold by MadVapes stores."

[3] MadVapes branded stores are located in North Carolina, South Carolina, Texas, Georgia, Massachusetts, Virginia, New Jersey and New Hampshire. [Complaint ¶14].

[4] Madvapes does not seek at this time to enforce the full scope of the territorial restrictions, but it has not fully abandoned the restrictions outside North Carolina and South Carolina (the only states in which AV operated).

Section 15 of the FA contains a very broad Trade Secrets and Confidential Information provision that purports to prohibit AV "during the Term [of the FA] or at any time after the expiration or termination of this Agreement" … from "directly or indirectly" … using or divulging "any trade secrets, confidential information, knowledge or know-how" concerning the business. "Any and all information, knowledge, or know-how, including, without limitation, drawings, materials, equipment, marketing, e-liquid recipes, and other data which Franchisor designates as secret or confidential shall be deemed Confidential Information [for the] purposes of this Agreement." In its briefing, Madvapes has not identified specific evidence in the record where it designated any particular information or data as secret or confidential (beyond referencing the FA and general statements regarding the "proprietary" nature of their business) and confirmed that it was not seeking to protect particular trade secrets at the motion hearing.

Section 18 of the FA imposes a number of obligations on the franchisee upon termination, including ceasing to hold itself out as a Madvapes franchisee, ceasing to use any of Madvapes' trademarks and returning property owned by Madvapes. Also, Madvapes can request assignment of the lease of the premises and if Madvapes does not request an assignment then the franchisee is required to make alterations to the premises "to distinguish the appearance of the premises from that of other Madvapes locations." FA, ¶ 18(a)-(e). This provision reflects the parties' apparent understanding that the franchisee may stay in the same location if Madvapes does not choose to exercise its right to take over the lease.

Section 21 of the FA is the Governing Law, Jurisdiction and Venue section. Section 21(a) contains a broad arbitration clause that requires that "any action arising out of or related to this Agreement, [etc.]"… shall upon 30 days written notice be resolved by binding arbitration in Wake County, in accordance with the Federal Arbitration Act under the Commercial Arbitration

Rules of the American Arbitration Association. In their Answer, Defendants asserted this arbitration provision as a defense.[5] Section 21(b), however, gives Madvapes the right to seek preliminary injunctive relief outside of arbitration. In Section 21(d) the parties "irrevocably" waive trial by jury in any action or proceeding between them. The parties chose the laws of the State of North Carolina to govern the FA and any claim or controversy among the parties. FA at ¶ 21(h).

The FA also includes several relevant addenda and agreements. Exhibit B is a Site Selection Addendum in which the parties agreed on a specific store location (the "Approved Location") and designated the Franchise Territory as "a radius around Approved Location within which a working population of approximately 15,000 exists …" In the FA, the parties agreed that the Site Selection Addendum was to be an "integral" part of the FA.

There is also a separate Nondisclosure and Noncompetition Agreement (Exhibit E), which purports to bind American Vapes and all its "managers, officers, beneficial owners, directors, employees, shareholders, partners, members, principals, immediate family members and domestic partners." However, only Wayne Kinley signed this agreement as AV's President. The restrictions in this agreement broadly mirror the confidentiality and noncompetition provisions in the Franchise Agreement itself.

Finally, there is a separate Telephone Listing and Internet Authorization Agreement (Exhibit F) in which AV is entitled to obtain telephone service under the Madvapes name. AV agreed as Franchisee that "such telephone numbers, listings and advertisements shall be considered the sole and exclusive property of Madvapes Franchising, LLC" and that "[u]pon

---

[5] At the motion hearing, Defendants' counsel represented that Defendants did not intend to seek arbitration, although counsel did not withdraw the defense.

termination, expiration, or non-renewal of the Franchise Agreement for whatever reason, Franchisee agrees to immediately cease all use of such telephone numbers…" AV also agreed to transfer the phone number to Madvapes, subject to Madvapes obligation to pay all fees related to the listing or phone service if Madvapes chose to request the transfer. Wayne Kinley and Bryan Hough signed this agreement on behalf of AV for the Statesville franchise location.

The parties' relationship began to unravel in 2018. On August 6, 2018, defendant Kinley applied for a trademark for the name "Mellow Vapes." Then, on December 18, 2018, American Vapes, through counsel, sent a notice of default to Madvapes for various alleged breaches of the Statesville Franchise Agreement, mostly related to the common advertising fund to which franchisees were required to contribute. AV claimed that Madvapes efforts to "cure" the alleged issues were insufficient and on March 20, 2019 sent a notice of termination of the Franchise Agreement to MadVapes. Madvapes claims that the termination did not satisfy the process for termination in the FA and that it was entirely pretextual as part of AV's plan to start a competing business.

Immediately upon the termination, Defendants changed the name of each of their franchised locations to "Mellow Vapes" and continued operating a vaping business from the same locations. The parties do not dispute that Defendants have told customers that they are no longer a Madvapes franchise and "wanted to do their own thing," (Complaint at ¶¶ 86, 91). Madvapes claims, however, that AV has made statements such as "new name – same great team" in their advertisements and customer communications, which it contends are wrongful.

Defendants allege that immediately following the termination, they began the process of "de-identification" of the MadVapes stores (such as removing signage), and that there are no longer any "Madvapes" signs inside or outside the stores. Also, Defendants allege that they no

longer sell Madvapes products. While Madvapes criticizes the amount of time (five to six weeks) that it says it took AV to make these changes, it does not challenge AV's representation that these changes have now been made. AV is, however, apparently continuing to use the same telephone numbers at all the former franchise locations. AV has also maintained the same Facebook page and internet site but has changed the identifying name to Mellow Vapes. Madvapes acknowledges these changes but alleges that AV has not yet removed all references to Madvapes in earlier social media posts contained within the Facebook site. With respect to the "Juice Bar" that was present in the stores while they were Madvapes franchise locations, there is no evidence in the record as to previous or current appearance of the "Juice Bar," but Defendants acknowledge that it is still in the same relative location in the stores.

### III.   DISCUSSION

Madvapes seeks injunctive relief in three general areas – (1) requests related to its trademark claims, (2) requests that defendants close their "Mellow Vapes" stores and not compete under the FA's noncompetition covenant and (3) requests related to other alleged de-branding and confidentiality obligations under the FA. Each is discussed separately below.

### A.   **Trademark Claims**

Related to its trademark claims, Madvapes seeks the issuance of a preliminary injunction to require Defendants to:

- Cease using the MadVapes Marks[6] (as defined in Complaint ¶16) or any trademark, service mark, logo, trade name or work that is confusingly similar to

---

[6] The Madvapes Marks, as defined in the Amended Complaint, are a series of registered trademarks showing the word MADVAPES or MADVAPES EXPRESS in all capital letters, some of which have a plume of smoke at the end of the mark.

the MadVapes Marks, including use in any way on any social media platform, on any product, in any advertisement or marketing materials;

- Eliminate the MadVapes Marks from any social media platforms, from any product and from any other advertising or marketing materials;

- Otherwise cease infringing the MadVapes Marks or using any similar designations, alone or in combination with any other components;

- Cease passing off any of Defendants' goods or services as those of Plaintiffs' or MadVapes' franchisees or in any way associated with or connected with Plaintiffs' or MadVapes' franchisees;

- Cease taking any action of any nature that is likely to cause confusion or misunderstanding as to the source of sponsorship of American Vapes' Mellow Vapes or Mellow Hemp Farms product with product of Plaintiffs; and

- Cease taking any action of any nature that is likely to cause confusion or misunderstanding as to Defendants' affiliation, connection or association with Plaintiffs' or MadVapes' franchisees or any of their products or services.

The parties do not dispute the elements of a claim for trademark infringement. In order to prevail on a claim for trademark infringement, Madvapes must demonstrate that: (1) it owns a valid and protectable trademark; (2) Defendants used the trademark "in commerce" without authorization; (3) Defendants used the trademark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) Defendants use of the trademark is likely to confuse consumers. 15 U.S.C. § 1114(1); *See Rosetta Stone, Ltd. v. Google, Inc*., 676 F.3d 144, 152 (4th Cir. 2012)

Defendants do not dispute the validity of the Madvapes trademarks, nor does there appear to be any dispute as to Madvapes' proof of the other elements of a claim for trademark infringement as they relate to any use of the registered "Madvapes" marks. AV's defense on the trademark claims is essentially only that the claims are moot because "[d]efendants are virtually de-identified from the Madvapes brand and are no longer using Madvapes marks or selling Madvapes products."

Accordingly, the Court finds that Madvapes has established a likelihood of success on its core trademark claims that AV cannot use the Madvapes trademarks. Further, Madvapes has established that it is likely to suffer irreparable harm without the preliminary injunction, the balance of equities tips in its favor and the injunction is in the public interest with respect to preliminarily enjoining Defendants from continuing any unauthorized use of the Madvapes trademarks.

However, the preliminary injunction will be narrowly drawn so that Defendants' obligations are clear as follows:

1. Defendants must cease any use of Madvapes trademarks in its signage or other designations of the source or identification of its stores or products.[7]

2. Defendants must remove Madvapes' trademarks from their internet site and Facebook page so that the Madvapes marks do not appear on the internet site and in prior Facebook or other social media posts; however, Defendants may maintain

---

[7] With respect to the sale of previously purchased Madvapes branded products in inventory, the Court finds that the issue is moot and does not address whether it meets all the elements necessary for a preliminary injunction in light of Madvapes' opportunity (which it chose not to exercise) under Section 13 of the FA.

its internet site and Facebook page so long as the Madvapes' trademarks do not appear.[8]

3. Defendants may not use (and must remove if such marks still appear) the Madvapes marks on customer receipts.

4. Defendants may use the Mellow Vapes name and associated marks, which Madvapes do not contend infringe the Madvapes' marks and do not seek to enjoin.

**B.    Noncompetition Claims**

Madvapes primary injunctive request is that the Court order Defendants to:

- Cease operating any Competitive Business (as defined in the Amended Verified Complaint (¶56) for a period of two (2) years from the termination of the Franchise Agreements in North Carolina and South Carolina and immediately cease the current operations of their Mellow Vapes stores located in the Franchise Locations and their Mellow Hemp Store in Belmont, North Carolina.

Under North Carolina law, contracts in restraint of trade are disfavored including covenants not to compete. *See Howard v. Oakwood Homes Corp.*, 134 N.C.App. 116, 121–22, 516 S.E.2d 879, 883, disc. review denied, 350 N.C. 832, 539 S.E.2d 288 (1999), cert. denied, 528 U.S. 1155 (2000). To be enforceable in North Carolina, a covenant not to compete must be (1) in writing; (2) made as part of the employment contract; (3) supported by valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate

---

[8] This injunction does not apply to a third party's use of the Madvapes' marks in social media posts <u>after</u> the date of this Order. If a third party posts a new message – unprompted by Defendants – that contains the Madvapes marks (for example comparing Mellow Vapes to Madvapes) then Defendants are not under an obligation to remove the post.

business interest. *Hartman v. W.H. Odell & Assocs., Inc*., 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).

However, when evaluating the enforceability of covenants not to compete, North Carolina courts note a distinction between those relating to the sale of business and those ancillary to employment contracts. *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 2012 WL 1693887, at *5, 2012 NCBC LEXIS 28, at *19 (N.C. Super. Ct. May 14, 2012), aff'd, 228 N.C. App. 613, 747 S.E.2d 256 (2013). Non-competes in franchise agreements have been held to present hybrid situations where courts should combine the elements used to evaluate non-competes for the sale of a business and those used to analyze employment contracts. *Outdoor Lighting*, 228 N.C. App. at 621–22, 747 S.E.2d at 263–64.

In *Outdoor Lighting*, the court stated:

> [t]he ultimate issue which we must decide in resolving such disputes among franchisors and franchisees is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the reasonableness of the duration of the restriction, the reasonableness of the geographic scope of the restriction, and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor.

*Id*. at 623, 747 S.E.2d at 264. Plaintiff has the burden to prove the restrictions of the covenant are reasonable. *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916.

"In evaluating reasonableness, the time and territory restrictions must be read in tandem." Id. at 311, 450 S.E.2d at 916; *see, e.g., Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 665, 158 S.E.2d 840, 844 (1968) ("Although a valid covenant not to compete must be reasonable as to both time and area, these two requirements are not independent and unrelated aspects of the restraint. Each must be considered in determining the reasonableness of the other."). While "either the time or the territory restriction, standing alone, may be reasonable, the combined

effect of the two may be unreasonable." *Farr Assocs. Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000). "If a non-compete covenant 'is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not enforce it.'" *VisionAir, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (quoting *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989)).

North Carolina courts have held that a two-year post-employment or post-sale non-competition restriction may be reasonable. See, e.g., *Kinston Med. Specialists, P.A. v. Bundle*, 2015 WL 2168893, at *3, 2015 NCBC LEXIS 48, at *7 (N.C. Super. Ct. May 7, 2015); see also *Hartman*, 117 N.C. App. at 315, 450 S.E.2d at 918.

However, "the scope of [a] geographic restriction must not be any wider than is necessary to protect the employer's reasonable business interests." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620; *see also A.E.P. Indus., Inc*., 308 N.C. at 408, 302 S.E.2d at 763. Courts look to six factors in determining whether a post-employment restriction is valid: "(1) the area, or scope, of the restriction, (2) the area assigned to employee, (3) the area in which the employee actually worked or was subject to work, (4) the area in which the employer operated, (5) the nature of the business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation." *Outdoor Lighting*, 228 N.C. App. at 622, 747 S.E.2d at 263.

An additional factor courts evaluate in the business sale context—and by extension the franchise context—is whether the restriction reasonably protects the goodwill of the plaintiff's business. *Id*. at 623, 747 S.E.2d at 264. Significantly for the purpose of this motion, "[t]o prove that a geographic restriction in a non-compete provision is reasonable, an employer must first

show where its customers are located and that the geographic scope of the covenant is necessary to maintain those customer relationships." *Farr Assocs.*, 138 N.C. App. at 281, 530 S.E.2d at 882.

Here, the Franchise Agreement identifies AV's franchise territory as a limited area encompassing a working population of approximately 15,000 (essentially the neighborhood of a large city or a single small town). Further, the FA specifically limits the franchisee's operations to a physical location, prohibiting internet sales. Also, the nature of the vaping business appears directed to individual local customers rather than institutional or commercial customers.

In this context, a covenant not to compete that extends to an entire state with a population of millions or to multiple states is plainly overbroad. Madvapes has not offered any evidence that Defendants serviced customers outside of the franchised territories or indeed any evidence of the location of the Defendants' customers. Therefore, Madvapes has failed to offer any evidence to support its contention that the territorial restriction in the FA protects its legitimate business interests. *See Beasley v. Banks*, 90 N.C. App. 458, 460–61, 368 S.E.2d 885, 886–87 (1988) (finding unreasonable a thirty-mile radius restriction where plaintiff failed to present specific evidence supporting his conclusory statement that he had customers within the thirty-mile radius and defendant offered evidence to the contrary). In the absence of such evidence, the geographic scope of the covenant is unreasonable and unenforceable as a matter of law on the current record.

At the motion hearing, Madvapes' counsel urged the Court to consider "blue penciling" the parties' contract to remedy the overbroad scope of the territorial restrictions. However, that doctrine cannot remedy the overbreadth of the covenant not to compete at this stage of the proceedings. "[B]lue-penciling is the process by which a court of equity will take notice of the divisions the parties themselves have made in a covenant not to compete, and enforce the

restrictions in the territorial divisions deemed reasonable and refuse to enforce them in the divisions deemed unreasonable." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 699, 784 S.E.2d 457, 461 (2016). The FA contains two territorial restrictions, encompassing (1) the state in which a franchised store is located and (2) within all the states where Madvapes has franchise locations. As discussed above, <u>both</u> territories are overbroad in the context of a franchise territory limited to a working population of 15,000, so removing each of these restrictions would leave the covenant without a territorial restriction at all, precluding enforcement. *See id*. at 699, 784 S.E.2d at 462.[9]

In summary, on its request for a preliminary injunction to enforce the FA's covenant not to compete, Madvapes has failed to establish a likelihood of success on the merits. Also, although the Court need not reach the other factors necessary to preliminarily enjoin the

---

[9] In addition to being overbroad in terms of its geographic scope, the FA's covenant not to compete may also not be enforceable (particularly against the individual defendants) because of the broad scope of its prohibition on Defendants' working for a competitive business. *See RLM Communications, Inc. v. Tuschen*, 831 F.3d 190 (4th Cir. 2016). In *RLM,* the court held that "restrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee," *Id*. at 196, *quoting*, *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C.App. 649, 670 S.E.2d 321, 327 (2009). *See also Copypro, Inc. v. Musgrove*, 232 N.C.App. 194, 754 S.E.2d 188, 192 (2014). Here, noncompetition covenant prohibits the Defendants from ***"[d]irectly or indirectly entering into the employ of, render any service to or act in concert with*** any person, partnership [etc] that owns, operates, manages, [etc]" any "Competitive Business" or ***"[b]ecome interested in directly or indirectly*** as an individual, partner, shareholder, …, agent, … spouse, or in ***any other relationship or capacity" any "Competitive Business.***" Defendants would accordingly be prohibited from any association or employment – directly or indirectly – with any competitive business, regardless of the nature of the employment and whether it has any connection to Madvapes' legitimate business interests (for example Defendants could not operate a software business that provides services to a vaping business). Therefore, the covenant not to compete may also be unenforceable for this independent reason, as it was in *RLM*. *RLM*, 831 F.3d at 196-97 ("Instead of focusing on employment that raises the risk that [defendant] will use knowledge obtained from RLM to RLM's detriment, the Noncompete targets the similarity of a new employer to RLM. That is not a sufficient limiting factor for a covenant not to compete.")

continued operation of the Mellow Vapes' stores, at least two of them – the balance of equities and the public interest – might well not support an injunction. Madvapes had the ability to protect its legitimate business interests in the territory by either buying out the franchisee, assuming its lease and/or buying its inventory. It did none of these things. Further, Madvapes has not at all addressed the harm that shutting down these businesses would cause to its employees beyond the named defendants. Thus, Madvapes has not made a clear showing that the balancing of the equities or the public interest justify an injunction in the context of a "disfavored" restraint of trade. Madvapes is therefore not entitled to a preliminary injunction on its noncompetition claim, and the Court declines to enjoin the Defendants as requested.

## C.    <u>Other Claims Under the Franchise Agreement</u>

Finally, in addition to its trademark and covenant not to compete claims, Madvapes asks the Court to require Defendants to:

- Immediately comply with all de-branding obligations in the Franchise Agreements and certify to the Court via sworn affidavit full compliance with the same; and

- Cease selling any product of any nature in its Mellow Vapes stores or in their Mellow Hemp Farm store (a) which they sold at any time while American Vapes was a franchisee of MadVapes or (b) which they developed, created or invented while a MadVapes franchisee;

- Cease taking any action of any nature whatsoever in violation of the confidentiality, non-use and non-disclosure obligations of Defendants as set forth in the Franchise Agreements.

In considering this final category of injunction requests, the Court must first address Defendants' contention that Madvapes has not sufficiently proven the existence of a signed franchise agreement for each location and that Madvapes provided the required franchise disclosures sufficiently in advance of the execution of each franchise agreement. While these issues are not entirely free from doubt, and it appears that Madvapes may have been, at a minimum, sloppy in documenting and preserving the evidence of the written agreements and disclosures, the Court finds that, only for purposes of the very limited preliminary injunctive relief being ordered,[10] that Madvapes has shown a "likelihood" (although, again, not a certainty) of the existence of signed written franchise agreements for each of Defendants' former Madvapes franchise locations and that Madvapes provided timely franchise disclosures for each location.[11]

On the issue of complying with the "de-branding" obligations under the FA, Madvapes more specifically requests the following:

- Requiring Defendants to cease using the same telephone numbers used at the former franchise locations;

- Change the signage in the stores to cease to identify the stores as a Madvapes franchise and not represent that the store is a Madvapes franchise;

- Requiring Defendants to return "customer data" to Madvapes and not retain or use that data in its Mellow Vapes business;

---

[10] The injunctive relief ordered with respect to Madvapes' trademark claims could be entered pursuant to federal trademark law independent of any obligations under the FA.

[11] If this matter proceeds further, Madvapes will of course need to prove the existence of signed franchise agreements and timely disclosures for each location by the appropriate standard of proof. The Court emphasizes that it has made no finding that Madvapes has yet made such a showing, only that it is "likely" to do so based on the current state of the record prior to discovery.

- Require Defendants to remove the "proprietary" "Juice bar" from the stores or move the bar to a different location in the store to make the store "have a different look and feel;"
- Prohibit Defendants from selling any product which Defendants sold in the former franchise locations while they were Madvapes franchisees, in particular any product with the Mellow Hemp Farm brand; and
- Prohibit Defendants from disclosing or using any other Madvapes confidential or proprietary information.

Regarding prohibiting the continued use of the telephone numbers that Defendants used while they were Madvapes franchisees, the Court finds that Madvapes is likely to succeed on the merits of that claim. The FA is clear that the parties agreed that the franchisee could not use the same phone numbers following termination. Indeed, counsel for Defendants acknowledged that if the FA were valid then Madvapes was entitled to enforce the telephone number restriction.

Similarly, the Court finds that Madvapes is likely to succeed on the merits of its claim that Defendants are not entitled to use Madvapes signage or tell prospective customers that the store is a Madvapes franchise. Again, counsel for Defendants acknowledged that if the FA were valid then Madvapes was entitled to enforce these restrictions. However, the Court does not find that Madvapes is entitled to prohibit Defendants from making any reference to the fact of their former history as a Madvapes franchisee. Specifically, Defendants will not be enjoined from making such statements as "new name – same great team" and "new name – same business" that make clear that Defendants are no longer associated with Madvapes (which is the point of the restriction) while informing customers that Defendants are still in the vaping business. On the

other hand, Defendants may not prominently use the Madvapes name to advertise their new business, for example by putting up a sign that says "former Madvapes franchise."

On the issue of "customer data," the Court also finds that Madvapes has made a showing of a likelihood of success on its claim that it owns "customer data" that is sufficient to support a very limited injunction. While all customer information related to the business, which might include the names of current customers or those who are listed as having "liked" Defendants' social media sites, is not owned by Madvapes, customer sales data prior to March 20, 2019 belongs to Madvapes under the FA. Accordingly, Defendants may not use that information and must return it to Madvapes to the extent Madvapes does not already have a copy of the information.

With respect to each of the foregoing categories of "other claims," Madvapes has also established that it is likely to suffer irreparable harm absent preliminary relief, the balance of equities favors Madvapes and the limited injunctive relief described above would be in the public interest. Therefore, the Court will enter a preliminary injunction enjoining Defendants from (1) any further use of the same telephone numbers used at the former franchise locations on or after August 5, 2019; (2) displaying any signage in the stores using the Madvapes name or identifying the store as a Madvapes franchise; (3) representing that the store is a Madvapes franchise or otherwise using the Madvapes name prominently in any advertising or marketing of Defendants' business; (4) retaining or using any customer sales data reflecting sales prior to March 20, 2019 (and ordering that any such data be returned to Madvapes to the extent it does not already have a copy).

However, with respect to its remaining requests Madvapes has not made an evidentiary showing to support a finding that it is likely to succeed on any of the claims underlying the

requests. While Madvapes argues that its Juice bar is "proprietary," it has not offered specific evidence of how the Madvapes "juice bar" looks and, as significantly, what makes it different than the "bars" at other "vaping" stores where customers can mix vaping liquids. In the absence of such evidence, there is no basis on which the Court can find that Madvapes is "likely" to succeed on its claim.

Also, Madvapes has not presented any evidence in support of its request that Defendants be prohibited from selling any product that they sold before the franchise was terminated. With respect to selling products and vaping equipment purchased from third parties, Madvapes has not identified the products that it says cannot be sold with any specificity. In the absence of such a showing (and perhaps even if such a showing was made), Madvapes cannot establish a likelihood of success on its claim, including proving that such a prohibition did not amount to an unenforceable restraint on trade or a covenant not to compete. Similarly, Madvapes has failed to offer evidence of the specific Mellow Hemp Farm products sold by Defendants prior to the termination of the franchise and what products are currently being sold so that the Court can determine Madvapes' likelihood of success. The Court accordingly declines to issue an injunction barring the sale of any Mellow Hemp Farm branded product.

Finally, Madvapes has not identified with specificity any trade secret or "confidential" or "proprietary" information, product or element of the business that it seeks to protect. The Court thus cannot find that Madvapes is likely to succeed with respect to this claim and declines to issue any injunction in the absence of a much more robust evidentiary showing.[12]

---

[12] Also, with respect to these final three requests, the Court has not reached the issues of irreparable harm, the balancing of equities and the public interest which must be determined in Madvapes favor before a preliminary injunction could issue.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

Defendants' Motion for a Preliminary Injunction (Doc. No. 16) is **GRANTED in Part and DENIED in part as described above.**

**SO ORDERED ADJUDGED AND DECREED**.

Signed: July 25, 2019

Kenneth D. Bell
United States District Judge